**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|                                 |   |                          |
|---------------------------------|---|--------------------------|
| In re:                          | § | **Chapter 11**           |
|                                 | § |                          |
| **THE SPOT AT ANDERSON, LLC,**  | § | **Case No. 24-90411 (MI)** |
|                                 | § |                          |
| Debtor.                         | § |                          |
|                                 | § |                          |

**DECLARATION OF JEFFREY ANAPOLSKY IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Jeffrey Anapolsky, the Chief Restructuring Officer ("CRO") to The Spot at Anderson, LLC, a Texas limited liability company (the "Debtor"), hereby declare under penalty of perjury:

1.      I am the founder and Managing Director of Anapolsky Advisors, Inc. ("Anapolsky Advisors"), a restructuring and turnaround firm, retained by the Debtor. I have served as the CRO for the Debtor since March 7, 2024.

2.      I contribute over 25 years of organizational leadership experience in finance, law and operations. I apply the valuable insights and creative solutions that I learned as an advisor (Bear Stearns, Wasserstein Perella), lender (T. Rowe Price), investor (American Capital), and lawyer (Akin Gump Strauss Hauer & Feld) to help private companies reach their highest potential by managing rapid change. My executive experience includes serving on an interim basis as Chief Financial Officer of Arcserve, LLC; Chief Financial Officer of Pinnacle Fertility, Inc.; Chief Executive Officer of BRH-Garver Construction, LLC; Chief Financial Officer of Community Dental Partners; Chief Financial Officer of Surefox North America; Chief Executive Officer for Veterinary Care, Inc.; and Chief Restructuring Officer for Humble Surgical Hospital, LLC.

3.      Before graduating with an MBA from Harvard Business School and JD from Harvard Law School, I earned a BS in Finance, *magna cum laude*, from the Wharton School of Business and BA in Mathematics, *magna cum laude*, from the College of Arts & Sciences at the University of Pennsylvania.

4.      In my capacity as the Debtor's CRO, I became generally familiar with the Debtor's day-to-day operations, business and financial affairs, books and records, capital structure, business, contracts, legal issues, and schedule. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon: (a) information supplied to me by MarketSpace (defined below), CIVE (defined below), the Prepetition Senior Secured Lender (defined below), the Subordinate Lenders (defined below), and public records; (b) multiple in-person visits to the Property (defined below); (c) my review of relevant documents; and/or (d) my experience, knowledge, and information concerning the Debtor's financial condition.

5.      I am over the age of 18 and I am authorized to submit this declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth herein.

6.      I submit this declaration (the "Declaration") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") filed on June 17, 2024 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), and the first day motions and applications filed contemporaneously herewith (the "First Day Motions") as well as to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this chapter 11 case (the "Case").

7.      This Declaration is organized into the following sections:

- Part I provides background information on the Debtor;

- Part II summarizes the Debtor's debt structure;

- Part III discusses the Debtor's agreement with PearlX (defined below);

- Part IV describes the circumstances leading to the commencement of this Case; and

- Part V sets forth the relevant facts in support of the First Day Motions.

## I.       Background



8.       The Debtor is a real estate entity that has mostly completed new construction of a 155-unit multi-family garden property (the "Project") situated on 4.46 acres located at 3917 Anderson Road, Houston, TX 77053 in Harris County (the "Property"). To improve traffic flow, reduce bottlenecks, and expand access to public transit, schools, businesses, and other destinations, Harris County is upgrading Anderson Road in 2024 from a two-lane asphalt road to a concrete roadway with (a) added turn lanes at intersections, (b) a new traffic signal at the Hiram Road intersection, (c) new eight-to-ten foot wide sidewalks on both sides of the roadway to provide safe access for pedestrians, and (d) underground storm sewers and a detention pond replacing roadside ditches to reduce street flooding.



**PLAT MAP**



9.      Upon completion, the Project will consist of a Class A three-story apartment building comprising 115,686 SF of gross building area and 112,186 SF of net building area. The average unit size will be 724 SF, as shown below:

| Type | Units | SF/Unit | SF/Type | % of Total |
|------|-------|---------|---------|------------|
| A1 | 94 | 600 | 56,400 | 50% |
| A2 | 10 | 639 | 6,390 | 6% |
| B1 | 27 | 900 | 24,300 | 22% |
| B2 | 12 | 956 | 11,472 | 10% |
| B3 | 8 | 1,100 | 8,800 | 8% |
| B3-B | 4 | 1,206 | 4,824 | 4% |
| Total | 155 | 724 | 112,186 | 100% |



A1: 600 SF



A2: 639 SF



B1: 900 SF



B2: 956 SF



B3: 1,100 SF

10.     The Debtor purchased the Property on December 20, 2019, from Anderson Road Baptist Church for $1,350,000. At that time, the Debtor was owned by MarketSpace Capital, LLC, a Texas limited liability company ("MarketSpace") and managed by The Spot at Anderson GP, LLC, a Texas limited liability company ("Spot GP"), which is controlled by MarketSpace.

11.     The Debtor has no employees and its day-to-day operations are managed by me.

12.     The Debtor has commercial property insurance effective February 5, 2024, and expiring July 5, 2024, in the amount of $13,600,000. The primary insurer is General Star Indemnity Company with a $10 million limit. The secondary insurer is Kinsdale Insurance Company for $3.6 million in excess of $10 million. Equipment breakdowns are insured by Liberty Mutual Insurance Company.

13.     Currently, CIVE, Inc. ("CIVE") is the general contractor and CE Engineers & Development Consultants, Inc. ("CE Engineers") is the architect for the Project. Utilities for the Project are paid by CIVE.

14.     As of the Petition Date, the Debtor's debt structure includes the following alleged amounts of principal, as well as alleged accrued and unpaid interest and fees:[1]

| Type | Amount |
| --- | --- |
| Senior Lien | $18,066,778 |
| Subordinate Lien | $5,830,529 |
| Tax Lien | $145,708 |
| Subtotal | $24,043,015 |
| General Contractor's Lien | $579,471 |
| Total Secured Debt | $24,622,486 |

---

[1] Each amount was provided by the applicable creditor and the Debtor is working with each creditor to verify the respective amount asserted to be owed. The Debtor reserves all rights with respect to the amounts asserted to be owed.

**DECLARATION OF JEFFREY ANAPOLSKY IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

## II.    Debt Structure

### A.    Secured Debt

#### a.    Senior Note

15.     On or about September 11, 2020, the Debtor borrowed $11,123,735 from BRMK Lending, LLC, a Delaware limited liability company ("Broadmark") pursuant to that certain Promissory Note (the "Senior Note"), initially maturing on October 1, 2021, that was secured by that certain Deed of Trust, Security Agreement and Fixture Filing with Assignment of Leases and Rents executed by the Debtor in favor of Broadmark and recorded on September 15, 2020, as Document No. RP-2020-434018 in the Official Public Records of Harris County, Texas (the "Senior Deed of Trust").

16.     On or about September 30, 2021, the Debtor and Broadmark entered into a first amendment with the primary purpose of extending the maturity of the Senior Note to December 1, 2021. On or about November 30, 2021, the Debtor and Broadmark entered into a second amendment with the primary purpose of extending the maturity of the Senior Note to May 1, 2022. On or about April 30, 2022, the Debtor and Broadmark entered in a third amendment with the primary purpose of extending the maturity of the Senior Note to August 1, 2022. On or about July 31, 2022, the Debtor and Broadmark entered into a fourth amendment with the primary purpose of extending the maturity of the Senior Note to November 1, 2022. On or about December 29, 2022, the Debtor and Broadmark entered in a fifth amendment with the primary purposes of (a) extending the maturity of the Senior Note to July 1, 2023, and (b) increasing the face amount and maximum balance of the Senior Note to $16,436,985, including closing costs and renewal fees.

17.     On or about August 22, 2023, the Debtor and Broadmark entered into a Modification, Renewal, and Extension Agreement (the "First Modification"), effective as of July 1, 2023. Per the First Modification, the Debtor acknowledged that (a) the outstanding principal balance of the Senior Note was $13,536,305.06 and (b) $3,040,147.65 remained available for advance. The parties agreed to extend further the maturity of the Senior Note to October 1, 2023.

18.     On or about May 31, 2023, Broadmark Realty Capital, parent of Broadmark, merged with Ready Capital Corporation ("ReadyCap").

19.     On or about June 7, 2023, BRMK Lending SPE I, LLC, as Delaware limited liability company, became the successor in interest to Broadmark.  Broadmark assigned all of its rights, title and interest in and to the Senior Note and the other Prepetition Senior Loan Documents, and all liens and security interests securing same, to the Prepetition Senior Secured Lender pursuant to an Assignment of Deed of Trust dated June 7, 2023, executed by Broadmark, as assignor, and recorded on August 2, 2023, as Document No. RP-2023-292345 in the Official Public Records of Harris County, Texas.

20.     On or about November 14, 2023, Broadmark sent a demand letter to the Debtor declaring that the Senior Note had matured and demanding payment in full.

21.     On or about April 3, 2024, BRMK Lending SPE JP, LLC, a Delaware limited liability company (the "Prepetition Senior Secured Lender"), recorded an assignment of the Senior Deed of Trust as Document No. RP-2024-117123 in the Official Public Records of Harris County, Texas whereby BRMK Lending SPE I, LLC assigned all of its rights, title and interest in and to the Senior Deed of Trust and the Senior Note to  BRMK Lending SPE JP, LLC.

22.     The Prepetition Senior Secured Lender provided a payoff letter good through May 31, 2024, alleging the following amounts:

| | | | |
|---|---|---|---|
| Principal Balance | | $ | 16,459,388.16 |
| Interest for the period of: | Remainder of July-2023 thru 29-Feb-2024; 01-May-2024 thru 20-May-2024 | $ | 1,222,753.46 |
| Default Interest (from BRMK) | Balance as of 06-22-2023 | $ | 288,378.47 |
| Draw Trimont | | $ | 850.00 |
| Legal Fee | | $ | 1,250.00 |
| Extension Fee | | $ | 82,882.26 |
| Late Fees | | $ | 9,376.00 |
| Release/UCC fee | | $ | 1,650.00 |
| Payoff Quote Preparation Fee | | $ | 250.00 |
| Net Payoff: | | $ | 18,066,778.35 |

### b.  Subordinate Note

23.     On or about December 20, 2021, MarketSpace and the Debtor entered into that certain Promissory Note (the "MarketSpace Note") in the amount of $5,400,000 (the "MarketSpace Loan"). The Marketspace Loan is secured by that certain Deed of Trust dated as of February 11, 2022, executed by the Debtor, as grantor, for the benefit of MarketSpace, covering the Property and recorded on March 18, 2022,

as Document No. RP-2022-144255 in the Official Public Records of Harris County, Texas (the "MarketSpace Deed of Trust").

24.     On or about May 16, 2022, MarketSpace, as borrower, entered into that certain Loan Agreement (the "Subordinate Loan Agreement") with PCGEZG, LLC, a Texas limited liability company ("PCGEZG"), and NPSSS, LLC, a Texas limited liability company ("NPSSS" and, together with PCGEZG, the "Subordinate Lenders"), as lenders, for a loan in the amount of $5,000,000 maturing on or about April 30, 2023 (the "Subordinate Loan") for the purposes of funding the loan by MarketSpace to the Debtor.

25.     The Subordinate Loan was secured by, among other things, that certain Pledge Agreement dated May 16, 2022 (the "Pledge Agreement"), as amended on March 5, 2024, executed by MarketSpace, Spot GP, and The Spot Investors, LP, a Texas limited partnership ("Spot LP").[2] Pursuant to the Pledge Agreement, as amended, the collateral for the Subordinate Loan included (a) 100% of the limited and general partnership interests of Spot LP held by MarketSpace and Spot GP, (b) 100% of the membership interests in the Debtor held by Spot LP, and (c) 100% of the membership interests of Spot GP held by MarketSpace.

26.     As set forth in the Subordinate Loan Agreement and as a condition to Subordinate Lender's extension of the Subordinate Loan to MarketSpace, MarketSpace assigned all of its rights, title and interests in, to, and under the MarketSpace Note and MarketSpace Deed of Trust to the Subordinate Lenders, pursuant to that certain Transfer of Note and Lien dated effective as of February 11, 2022, and recorded on May 20, 2022 as Document No. RP-2022-265023 in the Official Public Records of Harris County, Texas.

27.     On or about July 26, 2022, the Subordinate Lenders and Broadmark entered into that certain Intercreditor and Subordination Agreement (the "Intercreditor Agreement"). On or about January 4, 2023, the Subordinate Lenders and Broadmark entered into an amendment to the Intercreditor Agreement.

---

[2] On June 6, 2024, two petitioning creditors filed an involuntary petition pursuant to chapter 7 of the Bankruptcy Code in the Southern District of Texas against The Spot Investors, LP, filed at Case No. 24-32661.

28.     On or about March 6, 2024, the Subordinate Lenders each assigned all of their respective rights, title and interests in, to and under the Pledge Agreement, as amended, to Lighthouse Lending LLC, a Delaware limited liability company ("Lighthouse"), which is an affiliate of the Subordinate Lenders.

29.     On or about March 6, 2024, with the consent of Broadmark, which was then controlled by ReadyCap, and in lieu of Lighthouse enforcing its rights and exercising its remedies under and pursuant to the Pledge Agreement, Spot LP voluntarily assigned to Lighthouse, and Lighthouse assumed from Spot LP, 100% of the membership interests in the Debtor pursuant to that certain Assignment and Assumption of Membership Interest dated effective as of March 6, 2024. As a result, Lighthouse became the owner and holder of all of the membership interests in the Debtor.

30.     On or about March 7, 2024, (a) Spot GP resigned and was removed as the manager of the Debtor, (b) Lighthouse was elected and appointed as the new manager of the Debtor, (c) Spot GP resigned from all officer positions held in the Debtor, and (d) Lighthouse appointed Jeffrey Anapolsky as Chief Restructuring Officer of the Debtor.

31.     On or about May 23, 2024, the Subordinate Lenders provided an alleged payoff amount for the Subordinate Loan, as follows:[3]

| | |
|---|---|
| Principal | $4,474,000 |
| Interest | $1,156,529 |
| Est. Professional Fees | $200,000 |
| Subordinate Loan Payoff (5/31/24) | $5,830,529 |

**c.   General Contractor's Lien**

32.     On or about September 7, 2021, the Debtor and CIVE entered into an agreement for CIVE to replace Hwami (defined below) as general contractor for the Project and be paid $11,237,785,68 to complete the Project by September 2, 2022 (the "CIVE Contract"). There have been 17 change orders to the CIVE Contract totaling $2,393,346.90, bringing the total value of the CIVE Contract, as amended, to

---

[3] The Debtor reserves all rights with respect to the alleged amount asserted to be owed under the Subordinate Loan.

$13,631,132.58. These change orders collectively extended the Project completion date to January 31, 2024, due to alleged weather conditions, material shortages, delayed payments, and suspension of works.

33.     On or about September 1, 2023, CIVE filed a lien against the Property in the amount of $1,031,551.13, recorded as Document No. RP-2023-336580 in the Official Public Records of Harris County, Texas.

34.     On or about October 1, 2023, CIVE suspended work because no payment was made to CIVE for outstanding payment applications following the maturity of the Senior Note. In particular, CIVE had not been paid $642,295.33 for Pay App #18 and $427,686.46 for Pay App #19, totaling $1,069,981.79.

35.     In addition, CIVE claims (a) $69,722.72 for finance charges as of January 29, 2024, (b) $38,217.54 in additional finance charges as of March 1, 2024, (c) 55,294.45 for unpaid amounts relating to Pay App #12 on or about January 20, 2023, and (d) $139,277.67 relating to Pay App #17 on or about July 21, 2023, totaling $302,512.38.

36.     Finally, CIVE claims $506,610.68 for retainage.

37.     On or about December 4, 2023, CIVE filed an Amended and Restated Affidavit for Mechanic's and Materialman's Lien and Constitutional Lien in the amount of $1,771,164.59 (the "General Contractor's Lien"), recorded as Document No. RP-2023-455026 in the Official Public Records of Harris County, Texas.

38.     On or about May 2, 2024, CIVE filed a Partial Release of Lien recorded as Document No. RP-2024-160034 in the Official Public Records of Harris County, Texas. The Partial Release of Lien partially released and discharged the General Contractor's Lien but only to the extent of $1,191,693.34. CIVE specifically reserved and did not waive or release the remainder of the CIVE Lien in the amount of $579,471.25.

### d.   Tax Lien

39.     In addition, a lien in the amount of $145,707.92 was filed by Harris County on or about February 12, 2024, related to unpaid property taxes in 2023. Said tax lien was transferred to Resolution Finance, LLC ("Resolution Finance") pursuant to that certain Sworn Document Authorizing Transfer of

Tax Lien recorded against the Property on March 11, 2024, as Document No. RP-2024-84544 in the Official Public Records of Harris County, Texas.

**B.  Unsecured and Undisputed Debt**

        **a.  Hwami Builders**

40.     On or about November 17, 2019, the Debtor engaged Hwami Builders, LLC, a Texas limited liability company ("Hwami"), as general contractor for the Project pursuant to a contract to construct a 155-unit residential apartment complex at the Property for $11,245,000 commencing on January 2, 2020 (the "Hwami Contract"). Per the Hwami Contract, the structure of the building was to be completed by April 24, 2020, and substantial completion was to occur by February 3, 2021.

41.     On or about December 20, 2019, Hwami obtained property insurance benefiting the Debtor relating to the Property effective January 4, 2020, to May 4, 2021. On or about September 11, 2020, Hwami obtained liability insurance benefiting the Debtor (with Broadmark listed as additional insured on a primary and non-contributory basis) relating to the Property effective September 12, 2020, through September 12, 2021.

42.     Due to delays related to the COVID-19 global pandemic, the Debtor and Hwami amended the Hwami Contract on or about September 11, 2020, extending the timeframe so that the structure of the building was to be completed by December 15, 2020, and substantial completion was to occur by July 22, 2021. The Debtor paid $7.7 million to Hwami per the Hwami Contract.

43.     On or about August 21, 2021, the Debtor terminated Hwami for cause because, among other reasons, the structure of the building was not complete. The Debtor has accused Hwami of fraudulent billing practices, such as falsifying invoices and failing to pay subcontractors, and asserted damages of over $7.4 million.



44.     On or about September 21, 2021, Hwami submitted a lien affidavit and claim for $1,550,342.76 relating to work done on the Project as follows:

| | |
|---|---|
| June 2021 Draw Request | $546,000.00 |
| July 2021 Draw Request | $440,025.00 |
| Retainage | $564,317.76 |
| Total | $1,550,342.76 |

The Debtor disputes this lien, including, but not limited to, the amount owed, and whether it was ever properly perfected. Moreover, the Debtor understands that this lien was discharged by operation of Texas property law. Furthermore, since Hwami owes the Debtor over $7.4 million, no amount is due to Hwami as both a legal and practical matter.

45.     On or about February 21, 2022, the Debtor and Hwami attended mediation before mediator Louis Selig. The parties were unsuccessful at reaching a resolution.

46.     On or about April 11, 2022, the Debtor initiated an arbitration proceeding with the American Arbitration Association ("AAA") to resolve its dispute with Hwami. The AAA opened case number 01-22-0001-5194 and appointed Allison Snyder as arbitrator. The Debtor is seeking monetary relief, liquidated and unliquidated damages (including actual, consequential, special, and exemplary damages), equitable relief, attorney's fees, costs of court, pre- and post-judgment interest, disgorgement, restitution, an accounting, and all other legal and equitable relief related to breach of contract, fraud and fraudulent inducement, statutory fraud in a real estate transaction, conspiracy to commit fraud, unjust enrichment, negligence, negligent misrepresentation, equitable relief (recission), vicarious liability (piercing the

corporate veil), fraud by nondisclosure, violation of the Texas Trust Fund Act, violation of the Texas Theft Liability Act, and conversion.

47.     Discovery cutoff is currently July 29, 2024. Dispositive motions and expert challenges are due by August 26, 2024, with objections, oppositions, and responses due 14 days later. A pre-trial hearing is scheduled for October 3, 2024. A final hearing is scheduled for October 7-11, 2024.

48.     On or about June 12, 2024, the Debtor received an invoice in the amount of $20,400 from the AAA relating to the arbitration.

### b.   Other Unsecured Debt

49.     The Debtor will disclose its other unsecured obligations as of the Petition Date in the Debtor's Schedules and Statements of Financial Affairs when filed with this Court.

## III.    PearlX

50.     On or about March 30, 2022, MarketSpace and PearlX VPP Holdings, LLC ("PearlX") entered into that certain Property Lease Term Sheet and subsequently entered into the VPP Master Lease Agreement, dated as of September 30, 2022, as amended, restated, modified, extended or supplemented (collectively, the "PearlX Lease"). On March 8, 2024, MarketSpace assigned all of its right, title and interest in the PearlX Lease to the Debtor pursuant to that certain Name Correction Agreement and Assignment of Lease to The Spot at Anderson, LLC.

51.     According to www.pearlx.com: "PearlX was founded in 2019 and works with numerous multifamily owner-operators across California and Texas….[to] provide clean, reliable, smart grid power systems to thousands of residents at a reduced rate while increasing the NOI of owner-operators by installing and operating solar and battery storage systems and other electrification amenities on their properties. Our program helps property owners meet their ESG goals with no additional capital expenditures, as we install and maintain the system at no cost."

52.     Pursuant to the PearlX Lease, PearlX installed a system of solar panels and solar batteries in the parking lot of the Property in exchange for rights to repayment over a 20-year period.



### IV.   Events Leading to Bankruptcy

53.     On or about March 11, 2024, the Debtor and Broadmark, which was then controlled by ReadyCap, entered into the Second Modification, Renewal, and Extension Agreement (the "Second Modification") with respect to the Senior Note. Per the Second Modification, Broadmark extended the maturity of the Senior Note to August 1, 2024, paid $1,069,981.79 to CIVE relating to Pay App #18 and Pay App #19, paid $333,448.86 for property insurance premiums, and paid $22,000 to CE Engineers relating to past due invoices.

54.     The Debtor and Broadmark agreed that (a) $1,237,267.68 of construction costs remained based upon the cost estimate provided by CIVE and (b) up to $500,000 in non-construction costs remained to complete the Project. The Debtor and Broadmark agreed on a process for funding the remaining construction costs for the Project: Broadmark would fund up to $665,383.42 and the Debtor would fund up to $1,071,884.26, including at least $1.0 million to be received from a third party on an unsecured basis.

55.     As a result of being paid $1,069,981.79 relating to Pay App #18 and Pay App #19, CIVE agreed to resume working on the Project in April 2024.

56.     Despite its promises to invest at least $1.0 million in the Project, the third party failed to deliver any funds to the Debtor, rendering the Debtor illiquid and unable to pay CIVE promptly. Whenever the Debtor and MarketSpace inquired about the timing and amount of the funds, the third party responded with new funding criteria and other administrative hurdles. Ultimately, the Debtor lost confidence that this third party would fulfill its funding promises and was unable to find any other third party to fund this amount on an unsecured basis.

57.     On or about April 19, 2024, CIVE submitted Pay App #20 in the amount of $276,958.87 for the period ended April 18, 2024. On May 1, 2024, CIVE sent a Notice of Suspension of Work to the Debtor due to non-payment of Pay App #20. On or about May 6, 2024, CIVE submitted Pay App #21 in the amount of $88,052.88 for the period ended April 30, 2024.

58.     On May 14, 2024, the Debtor communicated to ReadyCap that CIVE had suspended work and the third party had not fulfilled its funding promises.

59.     As of the Petition Date, the Debtor is illiquid. To reach substantial completion of the project, there remains approximately 45 days of work, which is estimated to cost between $850,000-900,000. Key items remaining include (a) electrical (e.g., installing ceiling fans, ceiling lights, outlet covers, smoke detectors, circuit boxes and breakers, and air conditioning units), (b) plumbing (e.g., installing toilets), (c) bathroom mirrors and glass shower doors, (d) bedroom rugs, and (e) shoe molding. After substantial completion, it will take an estimated 2-4 weeks to obtain a certificate of occupancy from Harris County. Due to this timing, the Debtor will need to extend its property insurance.

60.     Faced with the aforementioned challenges and recognizing the Debtor's dire financial position, the Debtor, working with its advisors, has carefully evaluated what is needed to complete the Project and has determined in its business judgment that the commencement of this Case is the best course of action to preserve and maximize the value of the Debtor's estate for the benefit of creditors. In summary, obtaining post-petition financing to fund substantial completion of the Project and obtain a certificate of occupancy will enhance valuation, thereby benefiting creditors upon a sale on an "as complete" rather than an "as is" basis.

## V.      First Day Motions

### A.  DIP Financing Motion

61.      The Debtor needs an immediate capital infusion to complete the Project postpetition and to fund this Case. As of the Petition Date, the Debtor lacks sufficient funds to complete the Project and to pay its debts as they come due.

62.      The Debtor's advisors assisted the Debtor in evaluating potential financing and strategic alternatives for both out-of-court solutions and an in-court process. Based on this work, and after the Debtor concluded that an out-of-court restructuring was not a viable option, the Debtor determined, in consultation with its advisors, that procuring sufficient financing at the start of this Case would be essential to meet operational expenses and fund this Case.

63.      The Subordinate Lenders are willing to fund a debtor-in-possession loan ("DIP Loan") in the amount of up to $1.9 million on a superpriority, priming basis so that the Project can reach substantial completion and a certificate of occupancy can be obtained from Harris County. The proceeds of the DIP Loan will be used to pay:

a)  $276,958.87 in prepetition claims to CIVE as critical vendor (Pay App #20),

b)  $88,052.88 in prepetition claims to CIVE as critical vendor (Pay App #21),

c)  $850,000-$900,000 to CIVE for the construction costs remaining for the Project to reach substantial completion so that a certificate of occupancy can be obtained from Harris County,

d)  $250,000 to extend property insurance,

e)  Professional fees for this Case, and

f)  U.S. Trustee and other administrative expenses for this Case.

The Prepetition Senior Secured Lender declined the Debtor's request to provide the DIP Loan. Further, based on my knowledge of the DIP financing market, I know with a reasonable degree of certainty that no unrelated third party would provide the DIP Loan under similar terms and conditions as the Subordinate Lenders because of, among other things, (a) the relatively small size of the DIP Loan, (b) the nature of the

business being a multifamily development, and (c) the status of the Project as prior to obtaining a certificate of occupancy.

64.     Since the Prepetition Senior Secured Lender, CIVE, Resolution Finance, and Hwami (assuming, *arguendo*, that Hwami even has a valid claim) are oversecured, the Debtor's position is that there is no need to use the proceeds of the DIP Loan to make adequate protection payments to these parties.[4] In addition, the Debtor has obtained the consent of the Subordinate Lenders to prime their interest in the Property with the DIP Liens.

65.     Obtaining a certificate of occupancy is a critical step for improving the valuation of the Project because the Debtor can then begin leasing apartments to generate revenue. Once the Project can be occupied, the Debtor expects to market and sell the Property on an "as complete" basis at a price that is significantly higher than can be expected on an "as is" basis as of the Petition Date. The improvement in valuation is expected to exceed the amount of the DIP Loan.

66.     The Debtor and the Subordinate Lenders engaged in arm's length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law. Those negotiations led to terms that were ultimately more favorable than the Subordinate Lenders originally proposed, particularly regarding the DIP sizing and applicable interest rate. Accordingly, the Debtor has determined, in the exercise of its best and reasonable business judgment, that the debtor-in-possession financing to be provided by the Subordinate Lenders is the most favorable funding available under the circumstances and addresses the Debtor's immediate necessary financing needs during this Case.

67.     The financing available under the DIP Term Sheet and the DIP Orders will enable the Debtor, among other things, to substantially complete construction of the Project, obtain a certificate of occupancy, fund property insurance, and improve the value of the Property.

68.     Specifically, the Debtor will be able to pay CIVE to complete the following tasks:

| Task | Budget |
| --- | --- |
| Residential Kitchen Appliances | $124,754 |

---

[4] Further, as stated herein, the Debtor is requesting authority to pay certain of CIVE's prepetition claims.

| | |
|---|---|
| Plumbing System | $68,742 |
| Carpeting | $65,100 |
| Landscaping | $65,000 |
| Electrical | $51,535 |
| Window Blinds/Treatments | $50,000 |
| Final Cleaning | $45,000 |
| Sidewalks/Ramps | $44,682 |
| Painting | $41,433 |
| Fence & Gates | $39,855 |
| Toilet/Bath Accessories | $31,836 |
| Fire Alarm System | $24,747 |
| Master Water Meter | $22,938 |
| HVAC | $22,601 |
| Mirrors | $21,000 |
| Light Fixtures | $18,683 |
| Signage | $15,000 |
| Striping/WheelStop/Pkg Signs | $11,200 |
| Detention Ponds | $10,000 |
| Other | $77,492 |
| Total | $851,598 |

### B. Critical Vendor Motion

69.     CIVE, as general contractor for the Debtor, is an essential and critical vendor of the Debtor. Specifically, CIVE performs services – typically by and through various subcontractors, such as electricians, plumbers, carpenters, and others – and sources materials related to the construction and finalization of the Project, the primary business venture of the Debtor. At this late stage in development, no other third party could substitute for CIVE as general contractor for the Project because CIVE has unique, specialized knowledge about the Project, the subcontractors for the Project, the location of materials purchased for the Project, the remaining tasks and schedule for substantially completing the Project, and the detailed process for obtaining a certificate of occupancy for the Project. Specifically, I have interviewed multiple alternative contractors to consider the cost, timing, qualifications, and feasibility of replacing CIVE as general contractor for the Project and concluded that CIVE is a critical vendor for this Case.

70.     In sum, the failure to pay CIVE could critically damage the Debtor, its estate and its creditors and undermine the Debtor's objective of maximizing the value of the Property for the benefit of

its creditors. If CIVE is not paid, the Debtor has no reasonable expectation that CIVE would continue to do business with the Debtor going forward, especially considering that CIVE stopped work on May 2, 2024, due to lack of payment and has not resumed work since then. In conversations with the Debtor, CIVE has been clear that it would only return to work after Pay App #20 and Pay App #21 are paid. Accordingly, the Debtor seeks authorization to pay, in its discretion, Pay App #20 in the amount of $276,958.87 for work performed on the Project during the first half of April 2024, and Pay App #21 in the amount of $88,052.88 for work performed on the Project during the second half of April 2024 in order for CIVE to resume work on the Project.

71.     The Debtor does not seek to pay the entirety of CIVE's pre-petition claims. The relief requested herein only relates to Pay App #20 and Pay App #21 and excludes any other pre-petition claims of CIVE. Specifically, this Motion does not seek payment of CIVE's pre-petition claims for (a) $69,722.72 for finance charges as of January 29, 2024, (b) $38,217.54 in additional finance charges as of March 1, 2024, (c) 55,294.45 for unpaid amounts relating to Pay App #12 on or about January 20, 2023, (d) $139,277.67 relating to Pay App #17 on or about July 21, 2023, totaling $302,512.38, or (e) $506,610.68 for retainage.

**C.  Insurance Motion**

72.     The Debtor entered into insurance policies that provide coverage for the Debtor for property and equipment damage (collectively, the "Insurance Policies"). As of the Petition Date, the Debtor does not believe that it owes any amounts related to the Insurance Policies on account of obligations such as outstanding premiums, administrative fees or deductibles.  Nevertheless, to ensure uninterrupted coverage under the Insurance Policies, the Debtor seeks authority to pay any outstanding prepetition amounts owed related to the Insurance Policies, and to continue to honor its obligations under the Insurance Policies as they come due in the ordinary course of business on a postpetition basis, including continuation and renewal of the policies as necessary postpetition. In order to carry out the intent of the Insurance Motion, the Debtor requests that the banks and financial institutions on which checks were drawn, or electronic payment requests were made, in payment of pre-petition obligations for Insurance Policies be authorized

and directed to receive, process, pay, and honor all such checks and electronic payment requests presented for payment, and all such banks and financial institutions be authorized to rely on the Debtor's designation of any particular check or electronic payment request as being approved.

73.     The continuation and renewal of the Insurance Policies is essential to the preservation of the value of the Debtor's business and assets.  In many cases, insurance coverage such as that provided by the Insurance Policies is required by the applicable law and contracts that govern the Debtor's business operations.  Accordingly, I believe the relief requested in the Insurance Motion should be granted by this Court as being in the best interest of the Debtor's estate.

### D.  **Cash Management Motion**

74.     In the ordinary course of business, the Debtor currently maintains two bank accounts (collectively, the "Bank Accounts") both with B1 Bank (the "Bank"), an authorized depository of the UST (defined below).

75.     The Debtor's Cash Management System enables the Debtor to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. To lessen the disruption caused by this Case and maximize the value of the Debtor's estate, the Debtor believes it is essential that it be allowed to maintain its Cash Management System. Given the general demands of the Debtor's reorganization process, it would be unduly burdensome to require the Debtor to establish an entirely new system for the management of the Debtor's cash assets.  If the Debtor is not permitted to continue to use the Cash Management System, its operations would be severely disrupted.  Accordingly, the Court should authorize the Debtor's continued use of the Cash Management System.

76.     The United States Trustee (the "UST"), who administers bankruptcy cases filed in the Southern District of Texas, has issued certain UST Guidelines pursuant to 28 U.S.C. § 586.  The UST Guidelines require that Chapter 11 debtors, among other things, close all existing bank accounts upon filing of their petitions and open new "debtors-in-possession" accounts in certain financial institutions designated as authorized depositories by the UST.

77.     The Debtor is seeking a waiver of the UST requirement that the Debtor's Bank Accounts be closed and that new post-petition bank accounts be opened. If enforced in this case, the UST requirements would cause disruption in the Debtor's operations and ability to efficiently navigate this Case to a sale.  As described above, the Debtor's Bank Accounts comprise a cash management system that the Debtor must maintain in order to ensure efficient collections and disbursements in the ordinary course of its operations. Therefore, to avoid delays in paying debts incurred post-petition, the Debtor should be permitted to continue to maintain the Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations (with advance written notice to the UST and DIP Lender).

78.     Accordingly, the Debtor requests that this Court waive the strict enforcement of the requirement that the Debtor open new bank accounts.  The Debtor further requests that the Bank Accounts be deemed debtor-in-possession accounts and the Debtor be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document form as those employed during the pre-petition period.

79.     If the relief requested herein is granted, the Debtor will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of pre-petition claims, except those otherwise authorized by this Court, I submit that the Debtor will work closely with the Bank to ensure appropriate procedures are in place to prevent checks issued pre-petition from being honored absent this Court's approval. I do not believe that there were any checks issued pre-petition.

80.     Although the Debtor seeks authorization to utilize and retain its existing checks and Bank Accounts, the Debtor will maintain its books and records so as to provide a clear line of demarcation between pre-petition and post-petition transactions and operations.  If the relief requested in this motion is granted, the Debtor will not pay, and the Bank will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

81.     The UST Guidelines also state that disbursements other than by numbered check are prohibited. The Debtor is seeking relief from this requirement. The Debtor sometimes disburses funds by,

among other avenues, debits and wire transfers.  To the extent any such transfers are done in the ordinary course of the Debtor's business, the Debtor is seeking permission to continue such transfers. The Debtor will ensure that procedures are in place to track each transfer of funds, including, but not limited to, debits and wire transfers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 17, 2024                              _/s/ Jeffrey Anapolsky_____
Houston, Texas                                    Jeffrey Anapolsky
                                                  Chief Restructuring Officer
                                                  The Spot at Anderson, LLC

0157512.0788644  4877-1769-0561v15