**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| THE SPOT AT ANDERSON, LLC, | § | Case No. 24-90411 (MI) |
| | § | |
| Debtor. | § | (Emergency Hearing Requested) |
| | § | |

**DEBTOR'S <u>EMERGENCY</u> MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR**
**TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT LIENS AND**
**PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II)**
**GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER,**
**(III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING,**
**<u>AND (V) GRANTING RELATED RELIEF</u>**

Emergency relief has been requested. Relief is requested not later than 4:30 p.m. (prevailing Central Time) on June 18, 2024.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on June 18, 2024 at 4:30 p.m. (prevailing Central Time) in Courtroom 404, 515 Rusk, Houston, Texas 77002.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur." Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.

The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its proposed counsel, hereby moves this Court (this "Motion") for entry of an order authorizing post-petition secured financing, as described in more detail herein.  In support of this Motion, the Debtor respectfully states as follows:

## RELIEF REQUESTED

1.      By this Motion, the Debtor seeks entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A,[1] and a final order (the "Final Order" together with the Interim Order, the "DIP Orders"):[2]

      a.      authorizing the Debtor to obtain secured postpetition financing under Bankruptcy Code § 364(d) and also on a superpriority basis in the aggregate principal amount of up to $1,900,000.00 under Bankruptcy Code § 507(b) *as* follows:

            i.      a superpriority senior secured priming debtor-in-possession credit facility consisting of delayed draw term loans to be provided by the DIP Lender (defined below) pursuant to a financing agreement by and between the Debtor and the lenders thereto (the "DIP Lender" or "DIP Secured Party") (such facility, the "DIP Facility" and the claims thereunder, the "DIP Obligations"), consisting of $1,900,000.00 of new money ($1,100,000.00 of which is on an interim basis), pursuant to the terms of that certain *Superpriority Senior Secured Priming Debtor-In-Possession Financing Term Sheet* (the "DIP Term Sheet"), a copy of which is attached hereto as Exhibit B;

      b.      authorizing the Debtor to execute and deliver the DIP Term Sheet and any other agreements and documents related thereto (the  "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the DIP Term Sheet, DIP Credit Agreement, the First Day Declaration or in the Interim Order, each as defined herein, as applicable.

[2] The Debtor intends to file the executed *Superpriority Senior Secured Priming Debtor-In-Possession Financing Agreement* (the "DIP Credit Agreement") within 10 days of entry of the Interim Order. Additionally, the form of Final Order will be filed prior to the Final Hearing (as defined herein).

c.      subject only to the Carve-Out (defined herein), granting an allowed superpriority administrative expense claim in this Case (defined below) and any successor cases under the DIP Facility for all DIP Obligations;

d.      granting to the DIP Lender, automatically perfected priming security interests in and liens (the "DIP Liens") on the DIP Collateral (defined below, and including the Property (defined below) and all unencumbered property,  which liens shall be subject to the Carve-Out;[3]

e.      authorizing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, all to the extent provided in, and in accordance with, the DIP Documents;

f.      subject to entry of the Final Order, authorizing the Debtor to waive as to the DIP Lender and the Prepetition Senior Secured Lender (i) all of the Debtor's rights under section 506(c) of the Bankruptcy Code, (ii) the equitable doctrine of marshaling and any other similar doctrine with respect to the DIP Collateral and the Prepetition Collateral, as applicable, and (iii) the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Court;

g.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

h.      scheduling of a final hearing (the "Final Hearing") to consider final approval of the relief requested herein; and

i.      granting related relief.

2.      In support of this Motion, the Debtor submits the *Declaration of Jeffrey Anapolsky in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

---

[3] Upon information and belief, the Debtor has no property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code.

*Standing Order of Reference from the United States District Court for the Southern District of Texas,* dated May 24, 2012 (the "Amended Standing Order"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004, and 9014, Rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

6.      The Debtor commenced this chapter 11 case (the "Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 17, 2024 (the "Petition Date"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its businesses and managing its affairs as a debtor-in-possession.

## PRELIMINARY STATEMENT

7.      As discussed in the First Day Declaration, the Debtor is in urgent need of liquidity. As of the Petition Date, the Debtor lacks the financial wherewithal to fund its ongoing operations and complete the Project. The Debtor recognizes that filing this Case and obtaining approval of the DIP Facility provide the best opportunity to preserve and maximize value for its creditors.

8.      The financing to be provided through the proposed DIP Facility will permit the Debtor to pay its ongoing expenses and complete the Project, which is essential to maximize value to creditors. Proceeds of the proposed DIP Facility will be used to complete the Project and pay administrative expenses. The Debtor believes that the relief provided by authorizing the DIP

Facility will enable it to commence an expeditious but orderly sale and marketing process for substantially all of the Debtor's assets.

9.      For these reasons, and for the reasons set forth below and in the First Day Declaration, the Debtor firmly believes that entry into the DIP Loan is a sound exercise of the Debtor's business judgment and that approval of the DIP Facility is necessary to avoid irreparable harm to the Project  (through immediate access to funding under the Interim Order and to maximize the value of the Debtor's estate for the benefit of its creditors. Accordingly, the Debtor respectfully requests that the Court approve the entry of the Interim Order and Final Order.

## **CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001**

10.      The chart below contains a summary of the material terms of the proposed DIP Facility as required by Bankruptcy Rule 4001.

| Applicable Rule | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | The Spot at Anderson, LLC as debtor and debtor-in-possession in the Case is the Borrower under the DIP Facility.<br><br>*See* DIP Term Sheet; Interim Order |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | FM Future Holding Company LLC<br><br>*See* DIP Term Sheet; Interim Order |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Matures at the earliest of: (i) the date that is 120 calendar days after the Petition Date, (ii) the date of consummation of a sale of substantially all of the Debtor's assets, (iii) the date that is thirty (30) calendar days after the Petition Date (or such later date as may be agreed by the DIP Lender) if the Final DIP Order has not been entered, (iv) the occurrence of an Event of Default (as defined in the Interim Order) and delivery of an Enforcement Notice (as defined in the Interim Order) which is not cured as provided in the DIP Documents or waived,  or (v) the effective date of a plan of reorganization or plan of liquidation in the Case.<br><br>*See* DIP Term Sheet |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | Superpriority senior secured priming debtor-in-possession term loan facility in an aggregate principal amount of $1,900,000, comprising $1,100,000.00 on an interim basis and $800,000.00 on a final basis, in each case, to be paid into a disbursement account<br><br>*See* DIP Term Sheet |

| Applicable Rule | Summary of Material Terms |
|---|---|
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes customary conditions of borrowing, the satisfaction of which are a condition precedent to the obligations of the DIP Lender to make the DIP loans.<br><br>*See* DIP Term Sheet |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Rate: 12% per annum payable in kind and capitalized on a monthly basis<br><br>*See* DIP Term Sheet |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The equity cushion in the Prepetition Collateral protects the Prepetition Senior Secured Lender's interest as such no further adequate protection is required under the Bankruptcy Code.<br><br>*See* Interim Order |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | *See* Exhibit 1 to Interim Order |
| **Variance Covenant/Reporting**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Facility requires compliance with certain periodic reporting covenants, including the Approved Budget and variance reports. The Debtor is required to comply with the Approved Budget, subject to certain "Permitted Variances" as defined in the Interim Order.<br><br>*See* DIP Term Sheet; Interim Order |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Usual and customary defaults and events of default for a transaction of this type, and others as determined to be appropriate by the DIP Lender in its sole discretion, in each case that are satisfactory to the DIP Lender, including an event of default if the Debtor fails to pay when due any interest or principal.<br><br>*See* DIP Term Sheet; Interim Order |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens.<br><br>*See* Interim Order |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Indemnification and expense reimbursement provisions ordinary and customary for financings of this type.<br><br>*See* DIP Term Sheet |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | There is no cash collateral. |
| **Carve-Out**<br>Bankruptcy Rule | The Interim Order provides a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtor, as more specifically set forth in the Interim Order. |

| Applicable Rule | Summary of Material Terms |
|---|---|
| 4001(c)(1)(B) | *See* Interim Order |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Commitment Fee</u>: 1.5% of the DIP Loans, which shall be issued at net of the commitment fee and the Exit Fee.<br><br><u>Exit Fee</u>: 1.5% of the DIP Loan, which shall be issued at net of the Commitment Fee described above.<br><br>*See* DIP Term Sheet |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x) | No marshaling (or any similar doctrine) with respect to the DIP Collateral, and waiver of all section 506(c) claims (subject to entry of the Final Order)<br><br>*See* DIP Term Sheet; Interim Order |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B) | In no event shall the DIP Lender or the Prepetition Senior Secured Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or the DIP Collateral. Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Senior Secured Lender or DIP Lender.<br><br>*See* Interim Order |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order shall contain certain stipulations by the Debtor as to the enforceability of the Prepetition Subordinate Secured Debt, and the validity, priority and perfection of all liens securing the Prepetition Subordinate Secured Debt. However, for the avoidance of doubt and notwithstanding anything to contrary herein and as set forth in the Interim Order, the Debtor reserves all rights with respect to the amount of the Prepetition Subordinate Secured Debt.<br><br>*See* Interim Order |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | The DIP Facility will be secured by first priority priming lien on and security interests in on substantially all assets and property of the Debtor, whether now existing or hereafter arising and wherever located, including the Property (the "<u>DIP Collateral</u>") under section 364(d)(1) of the Bankruptcy Code.<br><br>*See* DIP Term Sheet; Interim Order |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Documents.<br><br>*See* DIP Term Sheet; Interim Order |

## SIGNIFICANT PROVISIONS UNDER THE COMPLEX CASE PROCEDURES

11.     The Interim Order, and the Final Order, as applicable, contain certain of the

provisions (the "<u>Significant Provisions</u>") identified in the Complex Case Procedures as set forth

below. In addition to the Debtor's specific justifications for the Significant Procedures, provided in the table below, the Debtor believes that each Significant Procedure is justifiable because the DIP Lender would not have provided the DIP Facility without such provision and the DIP Facility is fair and reasonable and the best financing option available under the circumstances.

| Provision | Status |
|---|---|
| **Non-Consensual Priming Lien** | Provision: See DIP Term Sheet and Interim Order<br><br>Reason for Provision:<br>In order to agree to lend under the DIP Facility, the DIP Lender requires a first priority priming lien in the Collateral. The priming of the Prepetition Senior Liens (and such other asserted interests, if any) is a necessary condition to entering into the DIP Loan, and the Debtor believes that the DIP Loan presents the Debtor's best available financing proposal.  Moreover, as demonstrated below, the Prepetition Senior Secured Lender (and such other asserted interests, if any) is adequately protected for the priming of its liens. Accordingly, the Debtor believes that the proposed priming provisions are appropriate. |

## THE DEBTOR'S PREPETITION CAPITAL STRUCTURE

12.     The Debtor has approximately $26.7 million of alleged liabilities[4], of which approximately $18,066,778.00 is alleged secured debt owed to the Prepetition Senior Secured Lender[5] (defined below) and approximately $5,830,529.00 is alleged secured debt, owed to the Subordinate Lenders[6] (defined below). Additionally, certain other creditors and governmental agencies may also purport to have liens on certain equipment or assets owned by the Debtor.  The remaining balance of the Debtor's obligations relate to alleged amounts owed to CIVE, Inc. ("CIVE"), the general contractor of the Project, disputed amounts purported to be owed to Hwami Builders, LLC ("Hwami") and those certain tax liabilities, as set forth in more detail below.

### a.     Senior Secured Debt

---

[4] This figure includes the amount asserted by Hwami (defined below) to be owed by the Debtor, which the Debtor disputes. The Debtor reserves all rights as it relates to Hwami, the Hwami Contract (defined below), the Dispute (defined below) and the Arbitration (defined below).

[5] The Debtor reserves all rights to contest the validity, amount, priority, and extent of the Senior Loan.

[6] The Debtor reserves all rights to contest amount of the Prepetition Subordinate Secured Debt.

13.     On September 11, 2020, BRMK Lending, LLC (the "Broadmark") extended a term loan in the original principal amount of $11,123,735.00 to the Debtor (the "Senior Loan") which is governed by that certain Construction Loan Agreement, dated September 11, 2020 between the Debtor and Broadmark.

14.     The Senior Loan is evidenced by that certain Promissory Note dated September 11, 2020, executed on behalf of the Debtor and payable to the order of Broadmark in the original principal amount of $11,123,735.00 (as such has been or may be further amended, restated, modified, renewed, extended, supplemented, replaced, increased or decreased in amount or otherwise changed from time to time, the "Senior Note"), bearing interest as therein provided, with all outstanding principal and accrued interest being due and payable as therein described, and with a stated maturity date of October 1, 2021.

15.     The Senior Loan purports to be secured (the "Prepetition Senior Liens") by, among other things, that certain Deed of Trust, Security Agreement and Fixture Filing with Assignment of Leases and Rents dated as of September 11, 2020, executed by the Debtor, as grantor, for the benefit of Broadmark, covering certain real property owned by the Debtor and situated in Harris County, Texas, as described more particularly therein (the "Land") and the Debtor's interests in and to all improvements situated thereon (the "Improvements", and together with the Land, the "Property"; the Property and any and all real or personal property that purportedly secures the Loan being referred to herein as the "Prepetition Collateral"), and recorded on September 15, 2020, as Document No. RP-2020-434018 in the Official Public Records of Harris County, Texas (as such has been or may be further amended, restated, modified, renewed, extended, supplemented, replaced or otherwise changed from time to time, the "Senior Deed of Trust", and together with

any and all other and additional deeds of trust, security agreements, assignments and other security instruments executed in connection with the Loan, the "Security Instruments").

16.    On or about September 30, 2021, the Senior Loan was renewed and the maturity date of the Note extended to December 1, 2021, pursuant to that certain First Amendment to Promissory Note dated September 30, 2021, executed by and between the Debtor and Broadmark (the "First Note Amendment").

17.    On or about November 30, 2021, the Senior Loan was renewed and the maturity date of the Note extended to May 1, 2022, pursuant to that certain Second Amendment to Promissory Note dated November 30, 2021, executed by and between the Debtor and Broadmark (the "Second Note Amendment").

18.    On or about April 30, 2022, the Senior Loan was renewed and the maturity date of the Note extended to August 1, 2022, and the stated principal amount of the Note was increased to $11,285,015.00, pursuant to that certain Third Amendment to Promissory Note dated April 30, 2022, executed by and between the Debtor and Broadmark (the "Third Note Amendment").

19.    On or about July 31, 2022, the Senior Loan was renewed and the maturity date of the Note extended to November 1, 2022, and the stated principal amount of the Note was increased to $11,313,228.00, pursuant to that certain Fourth Amendment to Promissory Note dated July 31, 2022, executed by and between the Debtor and Broadmark (the "Fourth Note Amendment").

20.    On or about December 29, 2022, the Senior Loan was renewed and the maturity date of the Note extended to July 1, 2023, and Broadmark agreed to make an additional advance to the Debtor in the amount of $5,090,893.00, thereby increasing the stated principal amount of the Note to $16,436,985.00, pursuant to that certain Fifth Amendment to Promissory Note dated December 29, 2022, executed by and between the Debtor and Broadmark (the "Fifth Note

Amendment", and together with the First Note Amendment, the Second Note Amendment, the Third Note Amendment and the Fourth Note Amendment, the "Prior Note Amendments").

21.     Broadmark assigned all of its rights, title and interest in and to the Senior Note and the other Prepetition Senior Loan Documents (defined below), and all liens and security interests securing same, to BRMK Lending SPE I, LLC pursuant to that certain Assignment of Deed of Trust, dated June 7, 2023, executed by Broadmark, as assignor, and recorded on August 2, 2023, as Document No. RP-2023-292345 in the Official Public Records of Harris County, Texas. BRMK Lending SPE I, LLC subsequently assigned all of its rights, title and interest in and to the Senior Deed of Trust and the Senior Note to  BRMK Lending SPE JP, LLC (the "Prepetition Senior Secured Lender") pursuant to that certain Assignment of Deed of Trust, Security Agreement and Fixture Filing With Assignment of Leases and Rents dated as of March 22, 2024 and recorded on April 3, 2024, as Document No. RP-2024-117123 in the Official Public Records of Harris County, Texas.

22.     On or about August 22, 2023, the Senior Loan was renewed effective as of July 1, 2023, and the maturity date of the Note extended to October 1, 2023, and the liens and security interests created and evidenced by the Security Instruments, including the Senior Deed of Trust, were likewise renewed and extended, pursuant to that certain Modification, Renewal and Extension Agreement dated August 22, 2023, but effective as of July 1, 2023, executed by and between the Debtor and the Prepetition Senior Secured Lender (the "First Modification", and together with the Prior Note Amendments and the Deed of Trust Amendment (defined below), the "Prior Loan Document Amendments").

23.     On or about March 11, 2024, the Senior Loan was renewed effective as of October 1, 2023, and the maturity date of the Note extended to August 1, 2024, and the liens and security

interests created and evidenced by the Security Instruments, including the Senior Deed of Trust, were likewise renewed and extended, pursuant to that certain Second Modification, Renewal and Extension Agreement dated March 11, 2024, but effective as of October 1, 2023, executed by and between the Debtor and the Prepetition Senior Secured Lender (the "Second Modification", and all of the foregoing, together with the Senior Note, Senior Deed of Trust, Prior Loan Document Amendments, as all of the same have heretofore been amended, supplemented, modified, extended, restated and/or replaced at any time prior to the Petition Date, collectively, the "Prepetition Senior Loan Documents").

24.     As of the Petition Date, the Prepetition Senior Secured Lender asserts that the Debtor is purportedly indebted to the Prepetition Senior Secured Lender under the Prepetition Senior Loan Documents in the alleged aggregate outstanding amount of not less than $18,066,778.00 (the "Prepetition Senior Secured Debt").

**b. Subordinate Secured Debt**

25.     On or about December 20, 2021, MarketSpace Capital, LLC, a Texas limited liability company ("MarketSpace"), extended a term loan in the original principal amount of $5,400,000.00 to the Debtor (as such may have been or may be renewed, extended, replaced, increased or decreased in amount or otherwise changed from time to time, the "MarketSpace Loan"), which MarketSpace Loan is evidenced by a Promissory Note dated December 20, 2021, executed on behalf of the Debtor and payable to the order of MarketSpace in the original principal amount of $5,400,000.00 (as such has been or may be further amended, restated, modified, renewed, extended, supplemented, replaced, increased or decreased in amount or otherwise changed from time to time, the "MarketSpace Note").

26.     The MarketSpace Loan is secured by, among other things, that certain Deed of Trust dated as of February 11, 2022, executed by the Debtor, as grantor, for the benefit of MarketSpace, covering the Property and recorded on March 18, 2022, as Document No. RP-2022-144255 in the Official Public Records of Harris County, Texas (as such has been or may be further amended, restated, modified, renewed, extended, supplemented, replaced or otherwise changed from time to time, the "MarketSpace Deed of Trust").

27.     On or about May 16, 2022, PCGEZG, LLC, a Texas limited liability company, and NPSSS, LLC, a Texas limited liability company (together with each of their respective successors and assigns, individually and collectively, whether one or more, "Subordinate Lenders"), extended a term loan in the original principal amount of $5,000,000.00 to MarketSpace (as such may have been or may be renewed, extended, replaced, increased or decreased in amount or otherwise changed from time to time, the "Subordinate Loan") for the purposes of funding the loan by MarketSpace to the Debtor under the MarketSpace Note, which Subordinate Loan is evidenced by a Promissory Note dated May 16, 2022, executed on behalf of MarketSpace and payable to the order of Subordinate Lenders in the original principal amount of $5,000,000.00 (as such has been or may be further amended, restated, modified, renewed, extended, supplemented, replaced, increased or decreased in amount or otherwise changed from time to time, the "Subordinate Note") and is governed by that certain Loan Agreement date May 16, 2022, executed by and between MarketSpace, as "Borrower", and Subordinate Lenders, as "Lenders" (as such may have been or may be amended, restated, modified, supplemented, replaced or otherwise changed from time to time, the "Subordinate Loan Agreement").

28.     The Subordinate Loan is secured by, among other things, that certain Pledge Agreement dated May 16, 2022, as amended by that certain First Amendment to Pledge Agreement

13

dated March 5, 2024, executed by MarketSpace, The Spot Investors, LP, a Texas limited partnership ("Spot LP"),[7] and The Spot at Anderson GP, LLC, a Texas limited liability company ("Spot GP", and together with MarketSpace and Spot GP, "Pledgors", and each a "Pledgor"), in favor of Subordinate Lenders (collectively, as such has been or may be further amended, restated, modified, renewed, extended, supplemented, replaced or otherwise changed from time to time, the "Pledge Agreement", and together with the Subordinate Note, the Loan Agreement and all other documents that evidence, secure, guarantee and/or govern the Subordinate Loan, individually and collectively, whether one or more, the "Subordinate Loan Documents"), pursuant to which Pledgors pledged, collaterally assigned and granted a security interest in and to (a) one hundred percent (100%) of the limited and general partnership interests in Spot LP held by MarketSpace and Spot GP, (b) one hundred percent (100%) of the membership interests in the Debtor held by Spot LP, and (c) one hundred percent (100%) of the membership interests in Spot GP held by MarketSpace, in each case, to Subordinate Lenders.

29.     As a condition to Subordinate Lenders' extension of the Subordinate Loan to MarketSpace as set forth in the MarketSpace Loan Agreement, MarketSpace assigned all of its rights, title and interests in, to and under the MarketSpace Loan, together with the MarketSpace Note, the MarketSpace Deed of Trust and all other documents that evidence, secure, guarantee and/or govern the MarketSpace Loan (individually and collectively, whether one or more, the "MarketSpace Loan Documents") and all liens and security interests that secure same, to Subordinate Lenders pursuant to that certain Transfer of Note and Lien dated effective as of February 11, 2022, executed by MarketSpace in favor of Subordinate Lenders and recorded on

---

[7] On June 6, 2024, two petitioning creditors filed an involuntary petition pursuant to chapter 7 of the Bankruptcy Code in the Southern District of Texas against The Spot Investors, LP, filed at Case No. 24-32661.

May 20, 2022, as Document No. RP-2022-265023 in the Official Public Records of Harris County, Texas.

30.     It is understood between the parties that (a) the proceeds of the Subordinate Loan were used to fund advances and other disbursements under the MarketSpace Loan, (b) the maximum aggregate amount of advances under the MarketSpace Loan were de facto limited to the maximum aggregate amount of advances permitted under the Subordinate Loan (i.e., $5,000,000.00), and (c) therefore, the MarketSpace Note and the Subordinate Note evidence the same indebtedness and the respective obligations of MarketSpace and the Debtor to repay the indebtedness evidenced by the MarketSpace Note and the Subordinate Note are, therefore, joint and several.

31.     On or about March 6, 2024, Subordinate Lenders assigned all of their respective rights, title and interests in, to and under the Pledge Agreement to Lighthouse Lending LLC, a Delaware limited liability company (the "Borrower Assignee"), which is an affiliate of Subordinate Lenders, or one (1) or more of them, pursuant to that certain Assignment and Assumption of Pledge Agreement dated March 6, 2024, executed by Subordinate Lenders, as "Assignor", and the Borrower Assignee, as "Assignee".

32.     With the Prepetition Senior Secured Lender's consent and in lieu of the Borrower Assignee enforcing its rights and exercising its remedies under and pursuant to the Pledge Agreement, on or about March 6, 2024, Spot LP voluntarily assigned to the Borrower Assignee, and the Borrower Assignee assumed from Spot LP, one hundred percent (100%) of the membership interests in the Debtor pursuant to that certain Assignment and Assumption of Membership Interest dated effective as of March 6, 2024 (said assignment and assumption being

referred to herein as the "Borrower Assignment"). Pursuant to the Borrower Assignment, the Borrower Assignee became the owner and holder of all of the membership interests in the Debtor.

33.     On or about March 7, 2024, pursuant to those certain Member Written Resolutions of the Debtor dated March 7, 2024, executed by the Borrower Assignee in its capacity as the sole member of the Debtor, and acknowledged by Spot LP and Spot GP, (a) Spot GP resigned and was removed as the Manager of Borrower, (b) the Borrower Assignee was elected and appointed as the new Manager of Borrower, and (c) Spot GP resigned from any and all officer positions held by Spot GP in Borrower.

34.     As of the Petition Date, the Subordinate Lenders assert that the Debtor is indebted under the MarketSpace Loan Documents to the Subordinate Lenders in the alleged aggregate outstanding amount of not less than $5,830,529.00 (the "Prepetition Subordinate Secured Debt").

**c.  Intercreditor Agreement**

35.     On or about July 26, 2022, Broadmark and Subordinate Lenders entered into that certain Intercreditor and Subordination Agreement dated July 26, 2022, and recorded on August 24, 2022, as Document No. RP-2022-430783 in the Official Public Records of Harris County, Texas (the "Original Intercreditor Agreement"), pursuant to which Broadmark and Subordinate Lenders agreed and confirmed that the MarketSpace Loan and all of Subordinate Lenders' rights, title and interests in, to and under the MarketSpace Loan Documents, and all liens and security interests securing same, were subordinate, inferior and subject to the Senior Loan and all of Broadmark's rights, title and interests in, to and under the Prepetition Senior Loan Document, and all liens and security interests securing same.

36.     In connection with the Fifth Note Amendment, and the increase in the maximum aggregate principal amount of the Senior Loan pursuant thereto, (a) the Senior Deed of Trust was

modified and amended pursuant to that certain First Renewal, Extension and Amendment to Deed of Trust, Security Agreement and Fixture Filing with Assignment of Leases and Rents dated January 4, 2023, executed by and between the Debtor and Broadmark and recorded on January 10, 2023, as Document No. RP-2023-9855 in the Official Public Records of Harris County, Texas (the "Deed of Trust Amendment"), and (b) the Original Intercreditor Agreement was amended pursuant to that certain Amendment to Intercreditor and Subordination Agreement dated January 4, 2023, executed by and between Broadmark and Subordinate Lenders and recorded on January 10, 2023, as Document No. RP-2023-9856 in the Official Public Records of Harris County, Texas (the "Intercreditor Agreement Amendment"; the Original Intercreditor Agreement together with and as amended by the Intercreditor Agreement Amendment are referred to collectively herein as the "Intercreditor Agreement"), pursuant to which Subordinate Lenders agreed to said increase and further confirmed that the MarketSpace Loan and all of Subordinate Lenders' rights, title and interests in, to and under the MarketSpace Loan Documents, and all liens and security interests securing same, were and continued to be subordinate, inferior and subject to the Senior Loan (as increased by the Fifth Note Amendment) and all of Broadmark's rights, title and interests in, to and under the Prepetition Senior Loan Documents, and all liens and security interests securing same.

### d.     Disputed Builder's Lien/Pending Arbitration

37.     On or about November 17, 2019, the Debtor engaged Hwami, as general contractor for the Project pursuant to a contract to construct a 155-unit residential apartment complex at the Property for $11,245,000 commencing on January 2, 2020 (the "Hwami Contract").

38.     On or about August 21, 2021, the Debtor terminated Hwami for cause because, among other reasons, the structure of the building was not complete. The Debtor has accused

Hwami of fraudulent billing practices, such as falsifying invoices and failing to pay subcontractors, and asserted damages of over $7.4 million (the "Dispute"). *See* First Day Declaration ¶ 33.

39.     On or about September 21, 2021, Hwami submitted a lien affidavit and claim for $1,550,342.76 relating to work done on the Project (the "Builder's Lien") recorded against the Property on September 28, 2021, as Document No. RP-2021-554706 in the Official Public Records of Harris County, Texas. The Debtor disputes this lien, including, but not limited to, the amount owed and whether it was ever properly perfected.  Moreover, the Debtor understands that this lien has been discharged by operation of Texas property law.[8]

40.     Accordingly, the Debtor and Hwami are currently in arbitration (the "Arbitration") over the Dispute and the validity, priority and enforceability of the Builder's Lien.  *See* First Day Declaration ¶¶ 36-37.

**e.  General Contractor's Lien**

41.     On or about September 7, 2021, the Debtor and CIVE entered into an agreement for CIVE to replace Hwami as general contractor for the Project and be paid $11,237,785,68 to complete the Project by September 2, 2022 (the "CIVE Contract"). There have been 17 change orders to the CIVE Contract totaling $2,393,346.90, bringing the total value of the CIVE Contract, as amended, to $13,631,132.58.

42.     On or about September 1, 2023, CIVE filed a lien against the Property in the amount of $1,031,551.13, recorded as Document No. RP-2023-336580 in the Official Public Records of Harris County, Texas.

43.     On or about December 4, 2023, CIVE filed an Amended and Restated Affidavit for Mechanic's and Materialman's Lien and Constitutional Lien in the amount of $1,771,164.59 (the

---

[8] Furthermore, since Hwami owes the Debtor over $7.4million, no amount is due to Hwami as both a legal and practical matter.

"CIVE Lien"), recorded as Document No. RP-2023-455026 in the Official Public Records of Harris County, Texas.

44.     On or about May 2, 2024, CIVE filed a Partial Release of Lien recorded as Document No. RP-2024-160034 in the Official Public Records of Harris County, Texas. The Partial Release of Lien partially released and discharged the CIVE Lien but only to the extent of $1,191,693.34. CIVE specifically reserved and did not waive or release the remainder of the CIVE Lien in the amount of $579,471.25.

**f.  Tax Lien**

45.     A lien in the amount of $145,707.92 was filed by Harris County on or about February 12, 2024, related to unpaid property taxes in 2023. Said tax lien was transferred to Resolution Finance, LLC ("Resolution Finance") pursuant to that certain Sworn Document Authorizing Transfer of Tax Lien recorded against the Property on March 11, 2024, as Document No. RP-2024-84544 in the Official Public Records of Harris County, Texas.

**g.     Unsecured Debt**

46.      The Debtor will disclose all unsecured obligations as of the Petition Date in the Debtor's Schedules and Statements of Financial Affairs when filed with this Court.

## THE DIP FACILITY

**a.     The Debtor's Need for Access to Financing.**

47.     As described in the First Day Declaration, the Debtor has an immediate need to use the proceeds from the DIP Facility to pay actual, necessary, ordinary course operating expenses, as set forth in the Approved Budget, which includes the costs and expenses associated with completing the Project and maximizing and enhancing the value of the Property for a proposed sale process.

48.     Absent access to the DIP Facility, the Debtor will be unable to meet all of its ongoing obligations and complete the Project. Approval of the DIP facility is crucial, and without such use, the Debtor's operations, its creditors and other parties in interest will suffer immediate and irreparable harm and its assets will markedly diminish in value going forward.

49.     In consideration for the post-petition use of the prepetition collateral, to the extent that the Prepetition Lender asserts rights to adequate protection, the Debtor proposes to protect the interests of the Prepetition Senior Secured Lender with replacement liens.

50.     The Debtor has carefully evaluated its operations, including determining potential liquidity needs for a chapter 11 case. As part of that analysis, the Debtor and its advisors have analyzed the Debtor's financial projections and liquidity position, and considered the adverse market conditions facing the Debtor.

51.     Based on these considerations, the Debtor and its advisors determined that smooth postpetition operations would require incremental liquidity of approximately $1,900,000. The Debtor believes the proposed DIP Facility will allow it to operate its business, complete the Project and satisfy all administrative costs and expenses associated with this Case as they come due, and to sufficiently market the Debtor's assets in an orderly process in this Case.

**b.     The Debtor's Efforts to Secure Financing.**

52.     The proposal before the Court represents the only available source of postpetition financing available to the Debtor. Substantially all of the Debtor's assets are encumbered under its prepetition secured loans. Second, the Debtor's equity position, if any, in the Property and cash needs to complete the Project substantially limited the Debtor's options for postpetition financing of the size necessary to fund this Case. As a result, although the Debtor attempted to

obtain post-petition financing proposals from other lenders, including its Prepetition Senior Secured Lender, it was unable to obtain post-petition financing on an unsecured basis.

53.     The Debtor needs an immediate capital infusion to complete the Project postpetition and to fund this Case. As of the Petition Date, the Debtor lacks sufficient funds to complete the Project and to pay its debts as they come due. *See* First Day Declaration ¶¶ 56-58.

54.     In light of the Debtor's absence of liquidity, the Debtor's advisors assisted the Debtor in evaluating potential financing and strategic alternatives for both out-of-court s o l u t i o n s  and an in-court process. Based on this work, and after the Debtor concluded that an out-of-court restructuring was not a viable option, the Debtor determined, in consultation with its advisors, that procuring sufficient financing at the start of this Case would be essential to meet operational expenses and fund this Case. *See* First Day Declaration ¶ 58.

55.     The proposed DIP Facility is critical to the Debtor's ability to administer this Case, provide the Debtor with sufficient liquidity to continue operations and complete the Project, and allow the Debtor to undergo an expedited yet orderly marketing and sale process. *See* First Day Declaration ¶¶ 60, 62, 64.

56.     The Debtor engaged in good faith, arm's-length negotiations with the DIP Lender with respect to funding this Case. *See* First Day Declaration ¶ 63. As part of the financing package, the parties focused on the ultimate DIP sizing, including the amount necessary to avoid irreparable harm and to put the Debtor on a path to financial and operational stability to allow for an effective marketing strategy. *See  id.*

57.     The negotiations among the DIP Lender and the Debtor regarding terms for a DIP were vigorous. *See id.* Those negotiations led to terms that were ultimately more favorable than the

DIP Lender originally proposed, particularly regarding the DIP sizing and applicable interest rate.  *See* First Day Declaration ¶¶ 60, 63.

58.     The DIP Facility will provide funding and structure for the Debtor's anticipated chapter 11 process, which will allow the Debtor sufficient time to market and sell the Property and in turn maximize value to creditors. *See* First Day Declaration ¶¶ 60,62.

59.     The terms of the DIP Facility are reasonable under the circumstances and were the product of good faith, arm's length negotiations, and such facilities will benefit all stakeholders and creditors in this Case. *See* First Day Declaration ¶¶ 60, 63-64.

60.     In connection with its entry into the DIP Loan, the Debtor is requesting that the Court authorize the priming of the prepetition liens against the Property in favor of the DIP Liens to be granted to the DIP Lender. As set forth below and in the First Day Declaration, the Debtor submits the interests of all stakeholders in the property, including the Prepetition Senior Secured Lender, CIVE, Resolution Finance and Hwami (assuming, *arguendo*, that Hwami even has a valid claim) are adequately protected in the event there is any diminution of value in the Property. Moreover, the DIP Facility will allow the Debtor to complete the Project which, in turn, will significantly increase the value of the Property, which benefits all creditors holding allowed claims. As a result, like the Prepetition Senior Secured Lender's interest in the Prepetition Collateral, the DIP Facility will also adequately protect all other creditors purported interest in the Property.  In addition, the Subordinate Lenders consent to the terms of the DIP Loan and the priming of their interest in the Property.  *See* First Day Declaration at ¶ 61.

**BASIS FOR RELIEF**

A.     **The DIP Loan Should be Approved**

61.     The Debtor proposes to obtain financing under the DIP Loan by providing security interests and liens and a superpriority administrative expense claim as set forth above pursuant to sections 364(d) and 507(b) of the Bankruptcy Code.

62.     If a debtor is unable to obtain adequate credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(a)     the trustee is unable to obtain such credit otherwise; and

(b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

63.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *See Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986) (adequate protection is determined by "circumstances of the case"). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  Although adequate protection can be provided in a number of ways, a secured creditor is entitled to protection against diminution in value of its interest in its collateral during the period of use and on account of the priming lien.  *See In re 495 Central Park*

*Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (purpose of adequate protection is "to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization"). The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process. *See, e.g., In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th. Cir. 1986); *In re Swedeland Devel. Co.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re 848 Brickell Ltd.*, 243 B.R. 142, 148 (S.D. Fla. 1998). This is true whether the prepetition creditor is oversecured or undersecured.  The protection to which the secured creditor is entitled is protection against any subsequent decrease in such creditor's interest in collateral that may be occasioned by the debtor's use thereof.  *See* 11 U.S.C. § 361. Accordingly, it follows that if the value of the prepetition creditor's interest in collateral is not being diminished by the priming of its liens by debtor in possession financing, the creditor is not entitled to adequate protection.  *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (prepetition creditors only entitled to adequate protection to the extent of the decline in value of their interests in collateral). Additionally, if a creditor's interest in collateral is wholly unsecured and there is no equity to support such creditor's lien at the time the chapter 11 petition is filed, the creditor is not entitled to adequate protection of its interest. *In re Levitt & Sons, LLC*, 384 B.R. 630, 642 & 644 (Bankr. S.D. Fla. 2008); *see In re Babcock & Wilcox Co.,* 2000 WL 533492 at *4 (E.D. La., May 3, 2000) ("Section 364(c) and (d)...do not provide for adequate protection to unsecured creditors.").

64.     Here, the Debtor has concluded that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the DIP Lender under the DIP Loan is currently unobtainable. Indeed, following the receipt of the proposal from the DIP Lender, the Debtor discussed potential debtor in possession financing facility with the

Prepetition Senior Secured Lender, who declined the Debtor's request to provide such financing. As a result, the Debtor proceeded to expeditiously negotiate with the DIP Lender. The Debtor ultimately concluded that the DIP Loan represented the best available financing for the Debtor under the circumstances. The Debtor believes that financing on the same or comparable terms (both monetary and non-monetary) is otherwise unavailable.

65. The proceeds of the DIP Loan will, in part, be used to finish the Project so it reaches completion. As set forth in the First Day Declaration, the deployment of the DIP Loan proceeds to complete the Project will result in a sales price for the Project that will result in full payment to the Prepetition Senior Secured Lender and all other allowed secured claims. This would not be the case if the Debtor were to liquidate, which is certain to happen if the DIP Loan is not approved.

### i. *Adequate Protection of Prepetition Senior Secured Lender and Other Creditors*

66. Upon information and belief, and as set forth in the First Day Declaration, the Prepetition Senior Secured Lender enjoys an equity cushion with respect to its Prepetition Senior Secured Debt. In fact, the Debtor believes that the value of the Prepetition Collateral exceeds the amount of the Prepetition Senior Secured Debt, the Builder's Loan  and the proposed DIP Loan.

67. The secured debt of the Prepetition Senior Secured Lender is approximately $18,066,778.00 respectively. The Debtor believes that the equity cushion enjoyed by the Prepetition Senior Secured Lender provides adequate protection to the Prepetition Senior Secured Lender in the event of any diminishment of the Prepetition Senior Secured Lender's interest in the Prepetition Collateral.

68. Further, because the proceeds of the DIP Loan will allow the Debtor to complete the Project and run an orderly sale process for the Property, the Debtor submits that the DIP Facility will increase the value of the Prepetition Collateral and enable the Debtor to sell the Property for

a much higher market price than without the DIP Loan or liquidation. Therefore, the requested postpetition financing, if approved, will itself adequately protect the Prepetition Senior Secured Lender's interest in the Prepetition Collateral. *See In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("[A]n increase in the value of the collateral ... resulting from the superpriority financing could constitute adequate protection.") (citing *In re First South Sav. Ass'n.*, 820 F.2d 700, 710 (5th Cir. 1987)).

69.     Based on the foregoing, the Debtor submits that the Prepetition Senior Secured Lender's interest in the Prepetition Collateral is adequately protected. Because the Debtor has demonstrated that (i) the same or superior financing is otherwise unavailable, and (ii) the Prepetition Senior Secured Lender will be adequately protected, section 364(d) of the Bankruptcy Code has been met and the Court should authorize the priming of the Prepetition Senior Liens by the DIP Liens in connection with the DIP Loan.

70.     The same is true for all other creditors of the estate, including CIVE, Resolution Finance and Hwami (assuming, *arguendo*, that Hwami even has a valid claim) as they are all adequately protected by the existing equity cushion and, due to the fact that the DIP Facility will undeniably increase the value of the Property, they will be additionally protected by the postpetition financing itself.  Indeed, here for these same reasons, the Subordinate Lenders have consented to the proposed DIP financing under Bankruptcy Code 364(d) provided by the DIP Lender, including the priming of their interest in the Property.

**B.**     **No More Favorable Alternative Financing is Available in Light of the Debtor's Current Financial Status**

71.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy

Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

72.     Substantially all of the Debtor's assets are subject to the Prepetition Senior Liens. Because of the amount of the Prepetition Senior Secured Debt and the current status of the Project, obtaining the financing needed by the Debtor as unsecured debt or debt which would be secured by liens junior to the liens of the Prepetition Senior Secured Lender was not and is not a realistic option, especially given the Debtor's circumstances. As noted above, the Debtor was unable to obtain credit that is not both secured and entitled to superpriority administrative claim status from any other financing source and, in fact, was unable to obtain credit on even a secured and superpriority administrative basis from any other source because the Debtor's prepetition obligations are secured by many if not all of its assets. While the Debtor tried in earnest through its financial advisors to secure any financing or more favorable financing to complete the Project, the Debtor was unable to locate any third-party lender to provide financing on better terms than the DIP Term Sheet, and after the Prepetition Senior Secured Lender declined to provide such funding, the Debtor had no choice but to negotiate with the DIP Lender, its only financing option. Thus, the Debtor can show "by a good faith effort that credit was not available without" the protections of section 364(d) and 507(b) of the Bankruptcy Code.  *Snowshoe*, 789 F.2d at 1088.

## C.     The Debtor's Need for Financing

73.     Unless the Debtor is authorized to obtain the financing requested herein, the Debtor will not have working capital to complete the Project and maximize value for creditors through a sale after the Petition Date.

## D.     The DIP Loan is Fair and Reasonable

74.     The Debtor believes that the terms of the DIP Orders and the DIP Loan are fair, just, and reasonable under the circumstances.  Specifically, the DIP Loan and DIP Orders are ordinary and appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Term Sheet and the DIP Orders have been negotiated in good faith and at arms' length by and among the Debtor and the DIP Lender, with all parties represented by counsel.  Accordingly, the Debtor believes that any credit extended under the terms of the DIP Orders is extended in good faith by the DIP Lender as that term is used in Section 364(e) of the Bankruptcy Code.

75.     Bankruptcy Courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money and/or obtain credit.  *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) ("More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Given the Debtor's current financial status, the Debtor is unable to obtain credit that is unsecured.  Accordingly, after appropriate investigation and analysis, the Debtor has concluded that the post-petition financing set forth herein is the best and only alternative available under the circumstances.

76.     Additionally, unless the decision is arbitrary and capricious, a bankruptcy court should defer to a debtor's business judgment regarding the need for, and the proposed use of, the

requested funds. *In re Curlew Valley Assoc.*, 14 B.R. 507, 511-13 (Bankr. D. Utah 1981).

Bankruptcy Courts will generally not second guess a debtor's business decisions when those

decisions involve "a business judgment made in good faith, upon a reasonable basis, and within

the scope of his authority under the Code." *Id*. at 513-14 (footnotes omitted).

77.     In the instant case, as discussed more fully above, the Debtor has exercised sound

business judgment by seeking advice from its legal and financial advisors in making the

determination that the DIP Term Sheet and the DIP Loan Documents are fair and reasonable and

in the best interest of the Debtor's estate. Accordingly, the Debtor should be granted authority

under section 364(c) of the Bankruptcy Code to enter into the DIP Term Sheet, the DIP Loan

Documents, the DIP Orders and borrow funds from the DIP Lender on the basis described herein,

on a secured basis.

78.     Ultimately, the relief requested in this Motion is vital to the Debtor. Without the

DIP Facility, the Debtor will be unable to finish the Project. The DIP Loan is critical to maximizing

the value of the Property as the proceeds will be used to complete the Project and fund a sale

process that will be proposed to the Court prior to entry of the Final Order.

79.     Here, it is contemplated that the Prepetition Senior Secured Lender will consent to

DIP financing under Bankruptcy Code 364(d) provided by the DIP Lender, subject to the terms

and limitations set forth in the Interim Order.

<u>**REQUEST FOR FINAL HEARING**</u>

80.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that

the Court set a date which is no later than 21 days after the entry of the Interim Order, to hold a

hearing to consider entry of the final order and the permanent approval of the relief requested in

this Motion. The Debtor also requests authority to serve a copy of the signed Interim Order, which

fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class

mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the final order under Bankruptcy Rule 4001(c)(2).

## **WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

81.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **NOTICE**

82.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk St., Ste. 3516, Houston, TX 77002, Attn: C. Ross Travis and Jayson B. Ruff (email: C.Ross.Travis@usdoj.gov and Jayson.B.Ruff@usdoj.gov); (ii) the holders of the 20 largest unsecured claims against the Debtor; (iii) BRMK Lending SPE I, LLC /Ready Capital Corporation, as prepetition senior secured lender, and counsel thereto, Munsch Hardt Kopf & Harr, P.C., 700 Milam Street, Ste. 800, Houston, TX 77002Attn: John Cornwell (email: jcornwell@munsch.com); (iv) Subordinate Lenders and counsel thereto, Davis Law Group, 1790 Hughes Landing Blvd., Ste. 400, The Woodlands TX 77380, Attn: Candice Davis (email: cdavis@cdavislawgroup.com); (v) FM Future Holding Company LLC, as DIP Lender, and counsel thereto, Shannon & Lee, LLP, 700 Milam Street, Ste. 1300, Houston, TX 77002, Attn: Kyung S. Lee (email: klee@shannonleellp.com); (vi) Hwami Builders, Inc, and counsel thereto, Funderburk Funderburk Courtois, LLP, 2777 Allen Parkway, Ste. 1000, Houston, TX 77019, Attn: Diane S. Davis and David Funderburk (email: ddavis@ffllp.com and dfunderburk@ffllp.com); (vii) CIVE, Inc.; (viii) Resolution Finance, LLC; (ix) the United States Attorney's Office for the Southern District of Texas; (x) the Internal Revenue Service; (xi) Office of the Texas Attorney

General; and (xii) those entities specifically affected by a specific motion Because of the exigencies of the circumstances and the irreparable harm to the Debtor that will ensue if the relief requested herein is not granted, the Debtor submits that no other notice need be given.

WHEREFORE the Debtor respectfully requests that the Court enter the Interim Order substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

[*Signature page follows*]

Dated: June 17, 2024      Respectfully submitted,

            **FROST BROWN TODD LLP**

            */s/ Rebecca L. Matthews*
            Rebecca L. Matthews, TX 24062776
            Mark A. Platt, TX 00791453
            2101 Cedar Springs Rd.
            Dallas, TX 75201
            Tel:  (214) 580.5852
            Fax: (214) 545.3472
            E-mail: rmatthews@fbtlaw.com
                mplatt@fbtlaw.com

            *Proposed Counsel for Debtor and Debtor in Possession*

**EXHIBIT A**

**INTERIM ORDER**

**<u>EXHIBIT B</u>**

**<u>DIP TERM SHEET</u>**

0157512.0788644   4889-1024-8129v21